REUBEN W. MILLSAPS *v.* WILLIAM D. CHAPMAN,
RECEIVER ET AL.

1. CORPORATIONS. *Directors. Resignation. Re-election.*

When a bank director resigns, buys property of the bank shortly
thereafter, and is thereupon re-elected director, he will be liable
as though a director when the property was purchased.

2. SAME. *Case.*

Where a person accepts the office of director of a corporation two
years in succession, is re-elected the two following years, attends
a meeting the last year and receives pay therefor, then resigns,
but accepts a re-election three months thereafter, he will, having
permitted himself to be advertised as a director during the entire
time, be held to have been a director during the three months be-
tween his resignation and last election, within the rule forbidding
the purchase, by a director, of the property of an insolvent corpo-
ration, paying therefor with the stock of the corporation, even if
there were no formal acceptance by him of his election in the third
and fourth year.

3. SAME. *Insolvency. Sale of property to director. Fraud.*

Where a director of an insolvent corporation purchases its property,
in part for cash and in part for the stock of the corporation, he
will be treated as a trustee. If the purchase was tainted with
actual fraud, the conveyance will be vacated and the purchaser
denied reimbursement for money actually paid for the property;
but if only constructively fraudulent, he may be permitted to re-
tain the property by paying the difference between the value of
the property at the time of the purchase and the cash purchase
money paid.

4. SAME. *Loan by director and another.*

A *bona fide* loan of money jointly by a director and another to an in-
solvent corporation may be secured by a mortgage on the property
of the corporation.

5. SAME. *Attorney's fee for collection.*

And a note for such a loan may lawfully stipulate for the payment
of an attorney's fee for its collection.

FROM the chancery court, second district, of Coahoma county. HON. A. H. LONGINO, Chancellor.

Chapman, receiver, etc., of the Clarksdale Bank & Trust Company and several creditors of that institution, the appellees, were complainants in the court below; appellant, Millsaps, and others were defendants there. The facts are stated in the opinion of the court.

*Brame & Alexander*, for appellant and cross appellee.

The lots sold by the bank to Millsaps were taken by the bank as security and were sold as a step in the collection of debts. Under the authorities, the purchase will be upheld. The price put upon the lots was $8,000. At this sum they were appraised by the directors. Millsaps estimated his stock at less than anyone. He was disgusted with the management of the bank and wanted to get clear of it. They had been carrying him on its minutes, without his knowledge, as a director, and he was, therefore, willing to let his stock go in at $500. He was not willing to pay $8,000 cash for the lots, and refused to do so. Surely a transaction like this will not be condemned when the bank collects $7,500 of the price in cash, and for the rest takes its stock at twenty cents on the dollar. This stock was not taken for cancellation. It was in the power of the bank to resell, and, for all that appears in the record, it may have done so. The underlying reason of every authority which holds that a bank may not thus take in its stock is that it results in injury to the stockholders and creditors. If it results in obvious benefit, then the reason of the rule fails and the transaction is valid. We confidently assert that this sale was highly beneficial to the bank. The bank had departed from a legitimate banking business so far as to own a compress. It had $15,000 of stock in the compress and $33,200 of its bonds. This compress was its best paying customer. One witness said it paid ten per centum one year to the bank. But the compress had no money, and a judgment enforcing a mechanics' lien

had been rendered against it, and the bank was on its appeal bond and the judgment had been affirmed. It was in the spring of the year, when the bank needed every dollar it could get to supply its customers. So great was the urgency that, when Millsaps declined for a month or more to take the property on their terms, the directors got Sullivan, who in turn got Roberts, a stockholder, not a director, to come to Jackson and urge Millsaps to buy the lots. Far from jumping at the chance to get this so-called bargain, Millsaps threw every obstacle in the way. He declined to buy for cash. He even declined to put in all of his stock for $500. It would seem that, if it was worthless, he would not have cared at what they took it. He also suggested the legal difficulty, and it was not until this was removed by the positive opinion of Sullivan and Cutrer, law yers, that the bank was solvent and that the sale was valid, that he gave the money and surrendered his stock. The bank was relieved, the stock was taken, and doubtless sold or held for sale, and nobody thought of making complaint about the transaction for more than a year, although the deed was immediately placed upon record and Millsaps put in possession. It is not shown that complainants, who were depositors, made their deposits before this purchase, or that they did not know of it. Campbell, who says he was agent for his mother, lived in Clarksdale and was a merchant. He himself is shown to have been handling some of the stock of the bank, and also, at about the same time, to have bought a store lot from the bank.

There was nothing clandestine about the purchase or the subsequent dealing with the property. As a matter of fact it appears that a majority of the stockholders knew of and assented to the purchase. Counting the directors and the stock they held and Virden and Tribette, this is a majority, and they are shown to have assented to the transaction.

It was necessary for complainants to do equity by tendering back the money. It went into the legitimate uses of the bank

in relieving its property from an incumbrance. *Vernon v. Tippah Co.*, 47 Miss., 187; *Philip v. Chamberlain*, 61 Miss., 740; Thompson on Corporations, sec. 6013, *et seq.*; *Natchez v. Mallery*, 54 Miss., 499.

On the question of the right of a bank to take its stock and reissue it, where the bank is to be benefited by it, see *St. Louis Rawhide Co.* v. *Hill*, 72 Mo. App., 142; *Calumet* v. *Investment Co.*, 96 *Ib.*, 147, s.c. 59 Am. St. Rep., 362; *Barto* v. *Nix*, 15 Wash., 562; *Vent* v. *Coffee County*, 64 Minn., 347; *N. E. Trust Co.* v. *Abbott*, 162 Mass., 148. As to the disability of a corporation to repudiate a contract as *ultra vires*, after full performance, see *McElroy* v. *Minn. Pea Co.*, 96 Wis., 313.

The evidence shows that Millsaps never had anything more than a nominal connection with the bank; he was never in Clarksdale, and did not know the officers and directors. After he took stock in 1892 there was only one dividend, and he was not even paid that, but was persuaded by the cashier to take it in stock while the others got theirs in cash. Up to this hour he has never gotten one dollar from the bank. He purchased this property at their urgent request and after earnest entreaties, and he has never seen the day since when he would not be willing to rue the bargain. Certain it is that the receiver has not yet offered to repay the money, with interest, and to have an accounting as to the net rents.

*Jayne & Watson*, on same side.

We think that the sale should stand as made. It was the act of the parties thereto, and carried out their wishes and intentions. It was reasonable and fair, and a court of equity will not disturb it. Being an executed contract it will not be disturbed, unless (1) *ultra vires*, or (2) violated paramount rights of third parties.

1. *Ultra vires:* We do not think the contract was beyond the charter power of the grantor. There is no statute or rule

of law in this state which forbids trading corporations from purchasing and selling real estate in the regular management of their business. They could do so at common law in the absence of statutory inhibitions. *Wood* v. *Meyer*, 7 So. Rep. (Miss.), 359; *Whitewat Veralley Canal Co.* v. *Vallett*, 62 U. S., 414.

The charter of the Clarkesdale Bank & Trust Company, with its amendments, provides in section 36 that: "Said corporation shall also have power to acquire and hold real estate as shall from time to time be necessary for the transaction of its business, or shall be found necessary and expedient to be acquired in the payment or settlement of any debt due it, or in order to secure in whole or in part such debt, and may sell and convey the same at pleasure, and it may purchase and sell personal property at pleasure." This provision gave the bank powers greater than was granted to the corporations in the two cases above cited. The principles announced in those cases certainly apply to banks, which are trading corporations. Especially is it the case when their charter powers authorized them to own real estate. 2 Am. & Eng. Enc. L., 92, notes. The charter of the bank in the last line, section 3 above recited, provides that the corporation " may purchase and sell personal property at pleasure." It would seem that such a provision would authorize it to purchase its own stock, even if it was not allowed to do so at common law or under the status of the law in this state in cases where no such provision was engrafted into corporate charters. However, the weight of authority in America " supports the view that corporations have the implied power to acquire in good faith shares of their own capital stock." 23 Am. & Eng. Enc. L., 676, and notes thereto; *Frazier* v. *Ritchie*, 8 Bradw., 554, where a perfectly solvent corporation sold certain property and took its own stock in payment. In *Dupee* v. *Boston, etc., Co.*, 114 Mass., 37, the court holding that a stockholder could not enjoin, says: " In the

absence of legislative provision to the contrary a corporation may hold and sell its own stock, and may receive it in pledge or in payment in the lawful exercise of its corporate powers.'' This doctrine is also upheld by the supreme court of the United States in *Johnson County* v. *Thayer*, 94 U. S., 631. These authorities are cited with approval in 1 Devlin on Deeds, sec. 114.

Was the grantee competent to take the property under the conveyance? The question should be answered in the affirmative. He was not a director in the bank at the time of the execution of the conveyance. The fact that he was a stockholder did not prevent him from being a legal purchaser, as that position entailed no trust relation upon him and was in no way inconsistent with the course pursued by him.

Was the conveyance violative of prior rights of third parties? None but creditors or stockholders who have been injured can complain if the conveyance was *ultra vires*. In this case the stockholders cannot complain, as they were in no way injured. From the facts it will be seen that the bank made a good trade when it took twenty-five hundred dollars of its capital stock at a five hundred dollar valuation, thus enabling it to work off its real estate for money, of which it stood much in need.

It has been repeatedly held that where a corporation entered into a contract part valid and part *ultra vires*, the court will uphold the part that was valid. 5 Thompson on Corporations, secs. 5975–5981. That author likens that principle to those announced by decisions on constitutional law, wherein statutes are upheld when valid in part and void in part. Thompson on Corporations, secs. 655–5981, and authorities cited, including *Campbell* v. *Union Bank*, 7 Miss., 625, and *Hamilton* v. *Dudley*, 2 Peters (U. S.), 526, the former decision being by Judge Sharkey, and the latter by Justice Marshall. This principle prevails in the law of contracts. *Newbury* v. *Stegall*, 41 Miss., 142; *Chicago, etc., Ry. Co.* v. *Pullman P. Car Co.*, 137 U. S., 79.

No offer to do equity, by tendering appellant his stock or its value, or his seventy-five hundred dollars, is made by appellee. This should have been done, and without having done so, relief should not have been granted them. Consequently, the bill of complaint, so far as it sought relief against appellant, Millsaps, as purchaser of the Harris Andrews and Weisinger properties, should have been dismissed. *McIver* v. *Clark*, 69 Miss., 408; *Newman* v. *Taylor*, *Ib.*, 670; *Mortgage Co.* v. *Jefferson*, *Ib.*, 770. The rule also applies if the contract be void under our laws. *Deans* v. *Robinson*, 64 Miss., 195. The rule is also enforced when the contract is *ultra vires*. 2 Morse on Banking, 740.

*Carroll & McKellar*, for appellees and cross appellants.

A court of equity will not permit the directors of a corporation, who are trustees not only for its stockholders, but also in a sense for its creditors, to dispose of the corporate property to themselves, or for their individual benefit, and this will be especially so where there has been the sale of corporate property by a single director, who has acted both as buyer and seller. 5 Thompson on Corporations, sec. 6530; *Howe* v. *Sanford Co.*, 44 Fed. Rep., 231; *Lippincott* v. *Carriage Co.*, 25 Fed. Rep., 586.

Under the general rule, as above stated, this sale cannot possibly be upheld. The fact of Millsaps being the buyer and one of the sellers is sufficient to set aside the sale and to charge him with the real value of the property. *Wilkerson* v. *Bauerle*, 41 N. J., Eq. Rep., 635.

Millsaps, seeing a good thing in the purchase, was quite ready to trade. Here the fact of his being a director made circuity of action advisable. This circumstance was readily met by a resignation as director spread upon the minutes. The resignation was inefficacious, for, "Where such a fiduciary or confidential relation has once existed, its influence may not pass away immediately upon the determination of the relation, and

dealings or transactions between the parties within a short time thereafter will be closely scrutinized.    8 Am. & Eng. Enc. L., 649.

The stumbling block of the directorship being thus conventionally and conveniently set aside, Millsaps became very anxious to make the trade.  He goes back to Jackson, however, without consummating it.    Thereafter, and until the sixteenth day of April, 1895, when the trade was finally consummated, letters and telegrams passed between himself and the bank almost daily about that purchase.

Almost immediately after the consummation of this sale, to wit, just fourteen days, Millsaps was again elected a director of that bank.  The price paid for the property was $7,500 in cash and $2,500 of the stock of the bank.  The proof shows conclusively that this stock was at the time absolutely worthless.

To state the facts in a concise form, we find the following: (1) The defendant Millsaps' knowledge of the exact condition of the bank, by reason of his having examined its assets and liabilities most carefully, item by item, on February 22, 1895; (2) his knowledge on that date that nearly half of the bank's capital had been loaned to directors, to one of whom more than twenty per centum of its capital having been loaned, which loan was long past due; (3) his knowledge and assertion that the bank had been badly managed; (4) his knowledge, as shown by his letters, that the bank was insolvent; (5) his knowledge that the bank had had great difficulty in obtaining loans; (6) his knowledge of the necessity that the bank was in for ready money; (7) his fiduciary relation to the bank; (8) his acknowledgment of his being a director, by reason of charging the bank with his expenses to attend the directors' meeting; (9) his advice to the bank that it should sell this property; (10) his great insistence that his advice should be taken; (11) in equity he was one of the sellers; (12) his entering into negotiations to buy this property, not only while he was a director, but while

he was taking part in a directors' meeting; (13) his resignation as a director as soon as these negotiations were opened; (14) his almost daily negotiations to purchase this property until he had purchased it; (15) his paying in part for it $2,500 of stock, which he knew was worthless; (16) his knowledge that this transfer of stock was illegal; (17) the great inadequacy of price paid for the property; (18) his re-election as a director immediately upon the consummation of his purchase; (19) his acceptance of that election; (20) his active participation thereafter in the affairs of the bank.

All these facts show that when Millsaps went to Clarksdale, on February 22, 1895, he found that with the ready money he could buy valuable properties at about half price, and that he let no duty that he owed to the bank interfere with his obtaining the property. He abused his trust; he took advantage of his fiduciary relation; he took advantage of the necessities of the bank; he was practically the seller and the purchaser. Under this state of facts, the sale should not only have been set aside, but the property should have been restored to the bank free of any lien or claim thereon by Millsaps; and whatever claim he may have had for money had and received, he should have been compelled to have filed it as a claim against the bank, as any other general creditor. This court has specifically decided this question in the case of *McLean* v. *Letchford*, 60 Miss., 169.

The third assignment of error involves the cross appeal and as well the consideration of the execution of the mortgage for $8,000, of date December 30, 1895, to Parker, trustee, for the benefit of two fiduciaries, Millsaps and Tribbette. This mortgage, and the sale of the same property by the bank to Alcorn, and the reconveyance by Alcorn to the bank, must be taken together, for they are one transaction. Whatever the intention of the parties, these three instruments were conveyances in fraud of the creditors of the bank, and are void. The sale to Alcorn without consideration, or a pretended consideration, his

immediate mortgage of the same to Millsaps and Tribbette to secure the loan of the bank of $8,000, demonstrate an act covered up and concealed from creditors and depositors designedly. A reading of these instruments will disclose that no one except a very careful person, and his special attention would have to be called thereto, would know from the description of the property that the bank had conveyed its building. It is not described as the bank building. It is only described by lot numbers. But assuming that it could be determined, from an inspection of the deed as recorded, that it was the bank's property that was being conveyed, these conveyances showed to the world that the bank had received $12,500 for its property, and, as a matter of fact, it did not receive but $8,000. The deeds on their face show that the transaction was a secret trust—the common form of a fraudulent conveyance. 8 Am. & Eng. Enc. L., 721, note and cases there cited.

"A conveyance absolute on its face, but intended as a mortgage, is constructively fraudulent as to creditors." *Beidler* v. *Crane*, 25 N. E. Rep., 655. "A conveyance of property absolute in terms, but in fact a mere security, is fraudulent as against the grantor's creditors, though no fraud was intended." *Watkins* v. *Arms*, 64 N. H., 99, s. c. 6 Atlantic Rep., 92. "A purchaser in bad faith will not be entitled to a restitution of the consideration, unless he proves that it inured to the benefit of the creditors by adding to the amount applicable to the payment of their debts." *Chaffe* v. *Gill*, 10 So. Rep., 361, s. c. 43 La. Ann., 1054.

Taking the deed to Alcorn and the trust deed from Alcorn to Millsaps and Tribbette and the reconveyance by Alcorn to the bank as one transaction, it is clear they show on their faces that while it was held out to the creditors of the bank that the bank got $12,500 for this property, as a matter of fact it only received $8,000 therefor. This renders the instrument void. The mortgage cannot stand to any extent as security or indemnity. *Boyd* v. *Dunlap*, 1 John. Ch., 478; *Dewey* v. *Boyer*,

72 N. Y., 70; *Billings* v. *Russell*, 101 N. Y., 226; *Baldwin* v. *Short*, 125 N. Y., 559.

In the last mentioned case, the court, speaking by Judge Finch, says: "A different rule would put a premium upon fraud against creditors, and if that may always be saved nothing is lost by the effort, and the temptation to venture it is increased." *Neuffer* v. *Pardue*, 3 Sneed, 191; *McCrasley* v. *Hasslock*, 4 Bax., 1.

Argued orally by *H. C. Watson* and *C. H. Alexander*, for appellants, and by *K. D. McKellar*, for appellee.

WOODS, C. J., delivered the opinion of the court.

The bill charges combination and confederation by the directors of the bank whereby and in pursuance of which they have wasted the assets of the bank, have used the deposits of creditors to pay obligations on which they were liable, and have violated their duty as directors, being trustees for creditors and depositors, all the while saving themselves harmless by thus using and appropriating the funds of the bank and those of depositors. In the nineteenth and twentieth paragraphs of the bill two specific objects are sought. In the nineteenth paragraph it is charged that the defendant, Millsaps, having resigned as director for that purpose, bought from the sorely straitened and really insolvent bank, for about one-half its value, certain real estate belonging to the bank, to wit: the Harris-Andrews and Weesinger properties, and soon after such purchase was re-elected a director. It is charged that he paid for the properties $7,500 in cash, and $2,500 in stock of the bank, then worthless, and that the properties were of the actual value of $10,000 to $12,000. The prayer of the bill is to set aside the sale, divest the title out of Millsaps, and revest it in the bank. If mistaken in this, the complainants seek a decree against Millsaps for the difference between the $7,500 cash paid by him and the actual value of the properties

at the time of the sale, inasmuch as the bank could not legally accept for property owned by it stock held by a director, and especially where the stock was worthless.

Was Millsaps a director at the time of the purchase? He was first elected a director in the year 1891, and he formally accepted. He was re-elected as a director in 1892, and was re-elected in the years 1893 and 1894. In his answer he states that he was not informed of his re-election in the years 1893 and 1894, and that he promptly resigned in February, 1894, on ascertaining the fact of his re-election for the year 1894. But it is shown that his name was continuously published to the public as a director in a newspaper issued in the town where the bank was located. It appears, moreover, that he presented to the bank his account for expenses incurred in attending the meeting held in February, 1894, and received the amount of the account as a director, as we must assume. There is nothing to indicate that stockholders had been paid by the bank their expenses incurred in attending a stockholders' meeting at which they were looking after their own interests only. It is significant, too, that, after his formal resignation in February, he purchased this property in April of the same year, and in May, the month following his purchase, he was again elected a director and formally accepted. He must, therefore, under these circumstances, be treated as a director and held to liability as one.

That the bank was in the year 1895, and had long been prior thereto, insolvent seems not open to controversy.

While the rule requiring directors of a bank, because of their fiduciary character, to act with the utmost good faith, and forbidding them to deal in the funds or property of the bank for their own personal advantage, is of universal recognition, we are of opinion that, substantially, the rule had proper enforcement in the court below. At the option of the bank, or its depositors and creditors, the sale of its corporate property to a director may be set aside, the purchasing director being

treated as a trustee of the property for the bank. The contract of purchase may be wholly annulled, if actual fraud entered into it, and the fraudulent and faithless director denied any reimbursement. If not corrupted by fraud in fact, the court may vacate the purchase, because made in violation of law, or may uphold it, and, in either case, where only constructive fraud is shown, require the fiduciary to account for profits, or the difference between the price actually paid and the real value of the property at the time of the purchase. The remedy will be moulded to meet the circumstances of each particular case.

In this case the respondent, Millsaps, appears to have been not anxious to make this purchase, as his letters to his co-directors show. They show also, we think, that he made the purchase without any willfully fraudulent purpose. But these letters likewise abundantly show that he believed, and had strong ground for believing, that the transaction could not legally be made, at least to the extent of using stock as part payment of the purchase price. He was so advised by his counsel. But he yielded to the solicitations of others, and while saying he "would ne'er consent, consented," just as other mortals have done and will continue to do. The court below did not think Millsaps should be treated as a trustee *ex maleficio*, and denied reimbursement to the extent of the $7,500 in cash actually paid by him, but that the purchase was fraudulent in law only, and that the purchaser, while entitled to be protected in his title, should be required to pay to complainants the profits derived by him from his purchase—that is to say, the difference between $7,500, which he paid in money, and the actual value of the property at the date of his purchase. This difference was found by the master, who took and stated an account to be about $4,600, including interest. The evidence as to the value of the property was conflicting. The court below confirmed the master's report, and we are not disposed to disturb that action. On the cross appeal from the

decree of foreclosure on the cross bill of Millsaps and Trib-
bette, we see no error in the decree of the court.   This was a
loan, pure and simple, made by Tribbette, who was never a
director, and Millsaps, of $8,000, on two years' time, and, we
entertain no doubt, entitled the mortgagees to foreclosure for
the satisfaction of their debt.   The item of attorney's fees
allowed Millsaps and Tribbette was strictly in accordance
with the terms of the contract made between them and the
bank.   The mortgage, it is true, provided only for a reason-
able attorney's fee, if the property should be sold by the
trustee named in it, but the note, whose payment was secured
by the mortgage, stipulated for a fixed attorney's fee if the
note had to be placed in the hands of an attorney for col-
lection, and by foreclosure decree as prayed in the cross bill
of Millsaps and Tribbette, the attorney's fees were a proper
charge against the mortgagor.

*Affirmed on direct and cross appeal.*