210 So.2d 35 (1968)
John J. BENTZ and Jackson Manufacturing Company of Mississippi
v.
VARDAMAN MANUFACTURING COMPANY.
No. 44682.
Supreme Court of Mississippi.
May 6, 1968.
*36 Woodrow W. Brand, Jr., Houston, Mitchell & Rogers, Tupelo, Smith & Smith, Corinth, for appellants.
John C. Satterfield, Jackson and Yazoo City, Satterfield, Shell, Williams & Buford, Kenneth G. Perry, Jackson, Gilder & Cook, James S. Gore, Houston, Lawrence Chandler, Calhoun City, for appellee.
JONES, Justice:
Appellee, Vardaman Manufacturing Company, sued appellants, John J. Bentz and Jackson Manufacturing Company, in the Circuit Court of the First Judicial District of Chickasaw County, and obtained a joint and several judgment for $53,203.03. The appellants appeal and appellee cross-appeals.
For the sake of brevity, we will refer hereafter to appellant John J. Bentz as "Bentz", appellant Jackson Manufacturing Company of Mississippi as "Jackson", and Vardaman Manufacturing Company, Inc., as "Vardaman."
Vardaman's declaration alleged that Bentz, who was executive vice-president and general manager of Jackson, became a director of Vardaman, and violated his fiduciary responsibilities which he owed Vardaman by using his position as director of Vardaman to the advantage of Jackson and to the injury of Vardaman. It further alleged that he, as such director in conjunction with his position as executive vice-president of Jackson, dominated Vardaman so that Vardaman did not receive a fair and *37 reasonable price for articles sold to Jackson. Appellees also sued upon a letter which stated as follows:
 May 24, 1961
Mr. G. Gilder
Vardaman Manufacturing Company
Vardaman, Mississippi
Dear Mr. Gilder:
This will confirm our telephone conversation of the 23rd concerning increased costs in making our frames for us due to the wage and hour law going into effect on September 3, 1961.
We agreed to a 10% increase on prices we are now using.
When you figure new costs for us on new numbers you are to quote us on the basis of your costs which will be in effect on September 3rd.
On lumber you are able to purchase and get on yard prior to the increase we hope that you will give us the benefit of such reduction. We will try between now and that time to give you some cutting orders which will enable you to make up frame stock for us during July and August.
Yours very truly,
JACKSON MANUFACTURING
COMPANY OF MISS.
John J. Bentz /s/
JOHN J. BENTZ
JJB:AR
CC: Roland Oswalt
Vardaman charged that appellants failed to pay the increase promised for several months.
We are affirming the case on both the direct and cross-appeals.
The allegation as to acts of Bentz requires a resume of the proof on that issue which the jury by its verdict accepted as true.
Jackson, located in Chickasaw County, was a manufacturer of chairs, and Vardaman, located in Calhoun County, manufactured frames for chairs. Business relationships between Jackson and Vardaman began about 1956. In June 1957 Jackson agreed to lend Vardaman the sum of $30,000 so as to enable it to expand and produce all frames required by Jackson. The loan was to be repaid in three annual installments. For additional security to that pledged, the two majority stockholders of Vardaman executed an agreement reciting that Jackson had been the principal customer of Vardaman and "a great boon to the development of this Company." It also stated the signers desired Jackson, in its own name or in the name of a legal representative, to purchase stock in Vardaman and have John J. Bentz, or some other person chosen by Jackson, become a director of Vardaman. It was agreed that at the next election Bentz, or whoever was designated by Jackson, would be elected as director and would continue as director until the debt was paid. The agreement, however, did not provide for cessation of the directorship when the debt was paid. This obligation was part of the contract for the loan of $30,000 and provided any default therein could be treated by Jackson as a default in the promissory note and pledge. Until the stock was purchased by Jackson, the majority stockholders who signed the agreement, appointed Jackson their attorney-in-fact with power to inspect any and all books, records, and accounts of Vardaman.
On June 17, 1957, the attorney for Jackson wrote the president of Vardaman requesting Vardaman to take note that the loan agreement gave Jackson a power of attorney, acting through any of its executive officers, to inspect the books, accounts, and records of Vardaman. Carbon copies of this letter were also sent to the secretary of Vardaman and to Mr. Bentz.
On September 17, 1957, Jackson wrote Vardaman advising that it wished to purchase two shares of stock at $100 each. Jackson was advised by the then president *38 of Vardaman (who had not signed the agreement) that none was available. On December 5, 1957, Jackson wrote Gilder and Ivy, the signers of the agreement heretofore mentioned, enclosing a check for $400 and requesting four shares of their personal stock. On December 27 Jackson again wrote Gilder and Ivy reminding them of their contractual obligation to sell Vardaman stock at $100 per share and demanding that it be done. These letters were signed by Bentz as executive vice-president. The stock was issued and was held to the date of the trial. Bentz was elected to Vardaman's board of directors at its next annual meeting. He continued to be re-elected each year until 1964. The loan was paid in three annual installments immediately following its consummation, but Bentz continued to be elected to the board of directors and Jackson continued as a stockholder to the date of the trial. G.G. Gilder, a signer of the agreement mentioned above, was a majority stockholder of Vardaman, the principal operator, and, for some time prior to the trial, Vardaman's president. Bentz was notified of his election to the board by Gilder and also was notified of the regular date of meetings of the board, although he did not as a matter of fact attend a meeting. He signed a waiver of the stockholders' special meeting on January 19, 1960, which was held for the purpose of acting upon a loan of not less than $100,000 and authorizing the execution of chattel notes and mortgages. He received notice of the meeting of the stockholders in January 1958, when he was first elected as director.
Gilder testified that after Vardaman borrowed money to expand and placed Bentz on the board of directors, Bentz from then on was kept informed of everything in connection with the business. Gilder said that he told Bentz what was being done. Gilder testified that from time to time Bentz would ask about the affairs of the company, such as the financial condition and its present operational status. Gilder further testified that when he was buying new equipment or anything, he would ask Bentz about it. Bentz would want to know the price of the equipment, the price being paid for lumber, the costs of labor, and whether or not the small business loan was current.
In addition to Gilder's testimony, a personal memorandum made by Bentz and dated May 26, 1960, was introduced which described a conference with Gilder the day before. The memorandum detailed Bentz's familiarity with and participation in the business of Vardaman. It recited that Gilder had come to Bentz's office to secure a check for the week's production. They had had a frank discussion about the situation and about Vardaman's involvements with other businesses. Bentz had asked whether or not Vardaman had borrowed any money from one Gus Ballard. He was told that Vardaman had but that the loan had been repaid. Bentz put in his memo that he knew Gilder called Gus Ballard the day that Jackson was paid the last $10,000 due on the note dated 1957. The memorandum says that the discussion covered the situation. It also indicated that Gilder had disclosed that Vardaman had borrowed in January $100,000 from Walter Heller Company at six percent and had given a mortgage on the machinery to be paid off at $3,000 a month including interest.
The memorandum recited that Vardaman also had made a loan with St. Louis Terminal Warehouse for about $20,000 through the Bank of Pontotoc on an eighty percent loan basis on lumber in their own yard. It further noted that Gilder had purchased all the interest of Ivy (the other signer of the agreement) and his wife, that Vardaman had become the sole owner of the new house erected for Ivy and the house occupied by Wayne Terrell, that Gilder had told him there was no mortgage on the property or improvements on the seventy-six acres on which the plant was located, and that later Gilder said that there was a $2,000 mortgage on the Terrell house. The memorandum listed various stockholders and noted that Gilder had said he had put $50,000 of his own money into the business in addition to his stock. The memo noted that Gilder had *39 advised Bentz that Vardaman was building a large burner for waste sawdust. Bentz said in the memo that he had told Gilder it was about time Vardaman stopped adding to the plant and started paying off its indebtedness.
Mr. Bentz testified he was familiar with Vardaman's stock ownership, its loans, its methods of handling business, its physical plant, and its equipment. Further, he admitted his knowledge and interest and participation in that connection continued through 1963. He further stated that Vardaman had lived up to its agreement that Jackson, or anyone authorized by it, would have the same rights and privileges with reference to the books, accounts, etc. as Vardaman's own stockholders. He said that he had never inspected the ledgers, cashbooks, and bank accounts, but he did remain familiar with the matters in general terms.
On October 17, 1963, Bentz wrote to Branyan Machinery, Inc., at Memphis, reciting that he had discussed by telephone on October 3 the planing machine purchased from Branyan by Gilder. The letter noted that a copy of the bill was sent to Jackson and that it indicated there was an outstanding balance of $1,841.23. In the letter, Bentz said that he had talked to a Mr. Horn by telephone concerning this piece of equipment and that Horn had stated the last time it was returned to Memphis nothing was done. Bentz's letter contained the details of what Horn had said he would do to the machine. Bentz wanted to know whether Branyan would authorize the return of the machine to Memphis and pay the transportation charges. He further wrote that Gilder had mentioned that the machine's "bed plate" needed planing for good operation. Bentz wrote that he hoped Branyan could authorize the machine's return to Memphis for adjustment by contacting Gilder directly. Bentz had made a handwritten memorandum of his conversation with Horn and of Horn's reply. The memo indicated that Bentz had suggested the machine be returned to Memphis since Horn had said he could make it work. On November 4, Branyan wrote Bentz to know what Bentz's connection with the matter was and why Branyan Machinery was expected to communicate with him rather than Gilder.
Many of the actions herein before mentioned were after April 30, 1960, when the last payment of the note upon the original contract was made. Bentz's testimony shows that he was still conferring with and advising Gilder; that he was familiar with Vardaman's assets, outstanding debts, methods of business, the plant and its equipment; and that Jackson at the same time was also the principal and almost sole customer of Vardaman. In the spring of 1964, Vardaman entered into a lease agreement with a company in Memphis known as Commat, Inc. Commat was to operate the plant. After a few weeks, Bentz said he was not going to deal with Commat anymore; thus Gilder agreed to go to Memphis and break the lease. Bentz accompanied him and wrote checks to Commat in settlement for the breaking of the lease. During their drive back, Gilder told Bentz that Vardaman could not operate as it had been going, that Jackson had been squeezing him on prices, that he just couldn't go any farther, and that he had to have some help. Bentz told Gilder he would lease the plant, and "since we are going to lease it, I will start handling the money now." Bentz did handle the finances for Vardaman from that time in May of 1964 until around the first of July, at which time Bentz decided not to lease.
While Bentz was handling the money, Vardaman did not receive any payment from Jackson on invoices for the frames supplied. Jackson purchased all supplies for Vardaman. At the end of each week Gilder would tell Bentz what the labor bill was. A check for that amount would be mailed, or else Gilder would take it up to the bank and put it in the payroll account. However, Jackson did not make the payroll checks for the last two weeks but walked off and left Gilder without any money. Consequently Vardaman ceased operations about June 30, 1964. During this time of operation by Jackson, Bentz, according to *40 the evidence, represented to an official of the Internal Revenue Service that he, Bentz, was leasing the plant and would take care of the payroll taxes which had accrued. Then the lease negotiations were suddenly stopped. On September 19, 1963, Bentz had written Gilder, who at the time was president of Vardaman, a letter in the nature of a resignation, stating that it was effective as of the date of the last payment on the $30,000 note. By this letter, he recognized he was a director during the existence of the loan. As heretofore shown, however, he had continued to act as director, and, even after writing this letter, he continued to act as director as shown by his involvement in the Commat deal in 1964.
It is our conception that these acts of Bentz in the handling of the affairs of Vardaman were in pursuance of his election as a director and presented a jury question as to the fiduciary relationship on his part, even though he did not attend the formal meetings. The issue was submitted to the jury.
Non-attendance at meetings does not relieve a director of liability. The rule is stated in 19 Am.Jur.2d Corporations section 1273 (1965):
It is not possible to limit the fiduciary duty of a director of a corporation to the time while he is acting as a director under any special delegation of power or is in attendance at meetings of the board. Such a limit would deprive the rule of almost all its efficacy and would facilitate innumerable evasions of its force. The fact that the power of a director to act for or to represent the corporation may be so limited, in respect to its being bound by his acts, does not furnish any ground for saying that his fiduciary character and consequent duties are subject to the same limit. On the contrary, these must be held to continue so long as his directorship continues.
In Knox Glass Bottle Company v. Underwood, 228 Miss. 699, 89 So.2d 799 (1956), sugg. of error overruled, 228 Miss. 789, 91 So.2d 843, cert. denied, 353 U.S. 977, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957), this Court held that directors of a corporation, although not trustees in a technical sense, occupy a fiduciary relation to the corporation. The Knox case is cited in 19 Am.Jur.2d Corporations section 1296 (1965), which is as follows:
Where the directors or officers of a corporation deal with themselves as individuals, the transactions are subject to the closest scrutiny under the most searching light of truth, and must be characterized by absolute good faith. It is said that such transactions are scanned by the courts with skepticism and the closest scrutiny, and may be nullified on slight grounds. If the transaction is challenged, the burden is upon the officer or director to prove good faith, fairness, and honesty in his transactions with the corporation. Even in the case where the corporation is represented by persons other than the director or officer personally interested in the transaction, it is held that the burden of proof is on such director or officer, in seeking to uphold the transaction, to prove good faith and fairness.
In the present case, Bentz as a director of Vardaman on one hand was dealing with himself, on the other hand as vice-president of Jackson in charge of operations and as the manager of Jackson, Bentz was personally interested in the profits, if any, obtained through the dealings with Vardaman. The burden of proving the fairness of the transactions was upon the appellants, since Bentz, in his position as vice-president, was acting to the benefit of Jackson (whose interest conflicted with Vardaman) and to the injury of Vardaman.
In Millsaps v. Chapman, 76 Miss. 942, 26 So. 369 (1899), Millsaps, after having resigned as a director of a bank in February 1894, purchased property from the bank in April 1894. In May 1894 he was re-elected as a director and accepted. He was *41 held to be liable as a director, although there was no fraud. There our Court said:
The contract of the purchase may be wholly annulled, if actual fraud entered into it, and the fraudulent and faithless director denied any reimbursement. If not corrupted by fraud in fact, the court may vacate the purchase because made in violation of law, or may uphold it, and, in either case, where only constructive fraud is shown, require the fiduciary to account for profits, or the difference between the price actually paid and the real value of the property at the time of the purchase. The remedy will be moulded to meet the circumstances of each particular case. Id. at 954, 26 So. at 370.
In this case Bentz, director of Vardaman and vice-president of Jackson, dealt with Gilder, another director and an executive officer of Vardaman, who was found by the jury to be under the domination of Bentz.
This situation is covered by 3 Fletcher Cyclopedia Corporations section 924 (Perm. Ed. 1965), where it is said:
If an officer of a corporation, either alone or with other officers, represents the corporation in making or authorizing a contract or other transaction, in which he is personally interested, either directly or indirectly, and his action or consent is necessary, the contract or transaction, even though it may not be void or voidable for want of two parties, comes within the well-settled rule that a trustee cannot become interested to the detriment of his cestui que trust, or an agent to the detriment of his principal.
Appellant Bentz insists that he was not a director of Vardaman during some of the weeks in which Vardaman was involved in the deal with Commat, and, therefore, was not liable. However, a director is not relieved from liability by the fact that plans which were made and partially carried out while he was in office are consummated after he has ceased to be a director. 19 C.J.S. Corporations § 761a (1940); 3 Fletcher Cyc. Corp. § 860 (Perm. Ed. 1965). Resignation does not sever accountability for a deal having its inception prior to the resignation. Albert A. Volk Co. v. Fleschner Bros., Inc., 60 N.Y.S.2d 244 (Sup.Ct. 1945), aff'd 273 App. Div. 995, 79 N.Y.S.2d 893, aff'd 298 N.Y. 717, 83 N.E.2d 15 (1948).
The Supreme Court of the United States stated the rule in Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425, 432 (1921), as follows:
The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328; Thomas v. Brownville, Ft. Kearney & Pacific R.R. Co., 109 U.S. 522, 3 S.Ct. 315, 27 L.Ed. 1018; Wardell v. Railroad Co., 103 U.S. 651, 658, 26 L.Ed. 509; Corsicana National Bank of Corsicana v. Johnson, 251 U.S. 68, 90, 40 S.Ct. 82, 64 L.Ed. 141.
The jury held, and was justified by the proof in holding, that Bentz and Jackson did not meet the burden.
The question as to joint and several liability of Bentz and Jackson is presented. Jackson received the benefits from the acts of Bentz, its executive officer, and should *42 share responsibility with him. Cf. Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799, 91 So.2d 843 (1956), citing 3 Fletcher Cyc. Corp. § 947 (Perm. Ed. 1947).
It is argued that an agent is not personally liable on a contract he is authorized to make. However, in this case, Bentz was not only agent of Jackson, but he was also director of Vardaman and acted in both capacities. As the agent of Jackson, he violated his duty to Vardaman, and Jackson received the benefits. Vardaman is suing Bentz for a violation of his duty as a fiduciary.
That part of the suit based on the "10% letter" was brought because of the failure of Jackson, through Bentz, to carry out the terms of the letter. Jackson would be liable on the letter, there being no dispute as to Bentz's authority to bind Jackson, and for the act of its agent in not observing the agreement. Bentz violated his duty to Vardaman in order to serve Jackson, and thus would be liable personally for his tortious conduct. Bentz was the cause of the breach of obligation of the 10 percent letter. See 3 Fletcher Cyc. Corp. § 947 (Perm.Ed. 1965).
UNDUE ADVANTAGE IN PRICING
Mr. Bentz testified the firm of Myer, Winer and Associates were the regular auditors for Jackson and that he had complete confidence in them. They made an audit for the year ending December 31, 1958, (the first year after the arrangement with Vardaman) and in their report stated:
The conclusions reached from the foregoing comments are that the reduced manufacturing costs are largely attributable to the decreased material costs. The gross profit was increased by 32.32 percent over 1957 with only [an] increase in sales of 5.85 percent. This simply means that your profits were increased by squeezing your manufacturing costs, namely material costs.
Harry Robinson, an accountant with M.M. Winkler and Associates, a public accounting firm (Robinson had been with Vardaman as office manager from 1957 to the early part of 1959 and was presently secretary to the company) had checked records of Vardaman and audits and other records of Jackson. He found that the percentage of frame cost to net sales from and including the calendar year 1957 to and through the end of fiscal year 1963 ranged from thirteen percent to 14.71 percent with the exception of a seven-month-accounting period in 1961 when it ran to 15.69 percent. He said the percentage for the year ending June 30, 1964, was 15.35. For the year ending June 30, 1965, when Jackson produced its own frames and also purchased from others, the percentage of frame cost to net sales was 18.55 percent.
His evidence was that this percentage in 1958 had been reduced to 14.00 percent as compared to 14.71 percent in 1957, while the gross profit in 1958 increased 32.32 percent with an increase in sales of only 5.85 percent. This is what Jackson's auditors referred to in their report on the year 1958, when they said such facts simply meant that profits were increased by "squeezing" on material costs. In large scale operations these differences in material costs are very substantial.
Robinson also examined the books and records of both firms. The prices for frames paid to Vardaman by Jackson were:

 From 1959 through 1961  25 cents per foot of lumber.
 During 1962  27.5 cents per foot of lumber.
 During 1963 & first half 1964  30 cents per foot of lumber

*43 The witness, Wayne Terrell, for many years engaged in the chair manufacturing business and was familiar with the way of figuring reasonable prices for such frames. He testified that the usual way was a footage basis on lumber used (with some variations on unusual frames) and that there was a waste factor on lumber of 48-50 percent. After having duly qualified to testify thereasto, he stated that the reasonable market value of frames not including dowels and doweling was:
1. 1958 to 1961  27 to 27 1/2 cents per foot.
2. Sept. 1961 to July 1964  30 to 32 cents per foot.
Mr. Gilder said the reasonable price in 1958 to 1961 was 30 cents per foot. He further said that in 1961 the cost of labor increased, lumber rose in price, and a reasonable price thereafter was 35 cents per foot. Neither price would include dowels or doweling. The cost for doweling should increase the price two cents per net foot.
The proof shows that for sometime Vardaman was required to furnish dowels and doweling with no increase in price. Further, the evidence of Gilder as to the fixing of prices on frames must be accepted by us because of the jury's finding.
While Bentz denied "fixing" the prices of frames sold to Jackson, he admitted, as testified by Gilder, they conferred on prices; and he did admit that on some invoices he "entered" the prices or "had them entered," or that he filled in and sometimes changed the prices.
Gilder's testimony was that from 1958 until about July 1962 Vardaman was paid twenty-five cents but that from 1958 to the end of their dealings he attempted to obtain an increase of at least five cents per foot.
He stated that Bentz would just refuse to raise the price and say, "No, I'm not going to raise it." This refusal, of course, was while Bentz was a director of Vardaman and an executive officer of Jackson, which, for all practical purposes, was the sole customer of Vardaman.
Gilder said he and his men would figure the cost and that Bentz sometimes would accept and sometimes lower it. He stated that when there was a disagreement "I would give him an argument but I never did win one."
Some invoices were introduced, and the evidence shows that the prices were placed on them either by Bentz or one of his employees. Gilder identified certain invoices as ones on which Bentz set the prices. He also said that after Bentz had set the price on a particular frame, it remained the same on that type thereafter, "unless he decided to cut it again." "He would just arbitrarily sometimes cut the price;" and if Gilder argued, Bentz would say "That's all I'm going to pay you." Bentz admitted that on some of the invoices shown him, he or one of his employees at his direction had entered the price.
We think the jury also had the right to consider Bentz's statement that each weekend Gilder would bring the invoices, needing the proceeds to meet his payroll  in other words, under necessitous circumstances.
When asked why he took prices fixed by Bentz, Gilder said Bentz was a director and he wanted to stay on good terms. In addition, though not stated by Gilder as a reason, Bentz was the one who directed and managed Gilder's most important customer. The jury had these facts before them in addition to others heretofore shown.

STATUTE OF LIMITATIONS  LACHES  ESTOPPEL
This case, as heretofore shown, arose from the breach of a fiduciary's obligation. *44 There was also a claim upon a promise of a 10% increase in price contained in a letter which is quoted hereinbefore.
Defendants plead the three-year statute of limitations, Mississippi Code 1942 Annotated section 729 (Supp. 1966) which covers actions on open accounts and unwritten contracts; but our six-year statute of limitations, Mississippi Code 1942 Annotated section 722 (1956), covers suits on written contracts, cases provable by writing and torts. The lower court held section 722 was applicable here.
The action was either in tort for a wrongful breach of duty [see Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799, 91 So.2d 843 (1956), citing Restatement of Torts § 874 (1939); compare Boyd v. Applewhite, 121 Miss. 879, 84 So. 16 (1920)], or it was a suit on the letter above quoted and would not be covered by section 729. The Court was correct in holding the six-year statute applicable.
Even in equity, there would be no laches insofar as events embraced within the six years immediately preceding the filing of the case is concerned. See Bolden v. Gatewood, 250 Miss. 93, 164 So.2d 721 (1964). The violation of the fiduciary relationship and the dominating influence continued until the business closed about the middle of June 1964. Suit was filed March 9, 1965.
Estoppel does not apply either. The jury found in effect that Bentz dominated Gilder. To constitute acquiescence and estoppel, the party against whom it is pled must act freely and voluntarily and not by reason of the domination of the party pleading estoppel. Further, it is simply a matter of making restitution of that of which the appellee was deprived by the wrongful tortious acts of appellants. For a definition of estoppel, see Crowe v. Fotiades, 224 Miss. 422, 80 So.2d 478 (1955).

ACCORD AND SATISFACTION
On September 5, 1962, Jackson issued its check to Vardaman for $7,994.78. The voucher attached to the check was as follows:

 #23737
 -----------------------------------------------------------------------
 Acct. Net
 Inv. Date Description of Payment No. Amount Discount Amount
 -----------------------------------------------------------------------
 343 9/4/62 S-15 230 8599.70
 Less Overpayment invoice 340
 Paid X-62 recliners  should
 have been rockers 502 @ .88 -441.76
 ________
 8157.94 163.16 7994.78

On this, appellants pled accord and satisfaction. Invoice #343 from Vardaman, prepared on typewriter, was introduced. It showed fourteen different items with the price for each chair frame, all delivered in August 1962, except one in September and one credit in June 1962. The last items totalled $10. The amount of the invoice as made by Vardaman was $8,599.70, and in ink was written credits reducing the amount to $7,994.78.
Invoice #340 also showed a deduction on account of the error mentioned on the check above shown in accord with the deductions on invoice #343 and the voucher. On the bottom of Vardaman's invoice #340 to Jackson (written on typewriter) appears written in ink, following a line drawn from *45 two items explaining the error near the top of the invoice, the words "These sh/been rockers. Deducted on check dated 9/5/62, #23737." Gilder's testimony was that the check above mentioned was to clear only the error on Invoice #340.
The evidence is insufficient to establish accord and satisfaction. Wunderlick v. State Highway Commission, 183 Miss. 428, 184 So. 456 (1938); Roberts v. Finger, 227 Miss. 671, 86 So.2d 463 (1956).

OBJECTIONS TO INSTRUCTIONS AND EVIDENCE
Appellants requested fifty-two instructions. They were given ten. The number requested was increased by the fact that in many instances the same instruction was asked for Bentz, for Jackson, and for both jointly. Appellees were given six instructions. Appellants assigned as error the refusal of numerous instructions.
We have considered all the instructions and think that taking them all together, the issue involved was fairly and concisely submitted to the jury and that there was no reversible error in refusing those not given to appellants nor in the giving of those for appellee.
There are numerous other assignments of error dealing with the admission of evidence and exhibits. Without detailing all these matters, suffice it to say we are unable to say any of said matters constitute reversible error.
The case is affirmed on direct appeal.

DAMAGES
Appellee cross-appeals, assigning as error the lower court's failure to enter a judgment N.O.V. for $507,989.71 or to set aside the verdict as inadequate and grant a new trial on the question of damages alone.
The damages claimed by appellee are for (1) cost of the dowels, (2) cost of the labor for doweling, both of which Gilder asserted he had to pay for without an increase in price, (3) the ten percent increase in price mentioned in the letter, and (4) a five cents net footage increase to bring prices paid to a fair and reasonable amount.
The witness Robinson, having testified he examined the records, prepared a statement, made without an audit, in which he gave his idea of the damages sustained. That statement is as follows:

SCHEDULE  AMOUNT OF ADJUSTMENT TO SALES AMOUNT DUE TO VARDAMAN MANUFACTURING CO., INC. BY JACKSON MANUFACTURING CO., OF MISS., INC.

At Dates Indicated

 LABOR
 FOR DOWELS
 DOWLING PURCHASED
 EXHIBIT # 1 EXHIBIT # 2
 Period Beginning March 13, 1959
 thru December 31, 1959 $11,060.00 $
 YEAR 1960 12,303.00
 YEAR 1961 11,612.00
 YEAR 1962 17,042.00 6,119.45
 YEAR 1963 17,393.00 9,402.19
 YEAR 1964 8,079.00 4,019.17
 __________ __________
 TOTALS $77,489.00 $19,540.81
 ========== ==========

*46
 INCREASE
 5¢ 10%
 PER NET PRICE
 FOOTAGE INCREASE TOTALS
 EXHIBIT # 3 EXHIBIT # 4
 Period Beginning March 13,
 1959 thru December 31, 1959 $ 72,192.89 $ $ 83,252.89
 YEAR 1960 71,932.42 84,235.42
 YEAR 1961 64,413.11 16,753.54 92,778.65
 YEAR 1962 85,668.82 22,313.74 131.144.01
 YEAR 1963 52,814.31 79,609.50
 YEAR 1964 24,871.07 36,969.24
 ___________ ___________ ___________
 $371,892.62 $ 39,067.28 $507,989.71
 =========== =========== ===========
(NOTE) This statement was prepared without audit.

Cross-appellant argues that since it was given a peremptory instruction on the ten percent letter issue, and since the jury found for more than Robinson asserted was due under that letter, there necessarily was a finding of more than $14,000 of damages on the other items.
We, of course, do not know how the jury arrived at its verdict. It was not required to accept any witness's exact figures. It may have found the amount due under the ten percent letter at much less than the figure shown on the statement. It may have considered the words "prepared without audit" as weakening the statement. The jurors, watching and listening to the witnesses, may have thought the five cent increase claimed was high. They might have considered the dispute about Bentz fixing the price and may have found for cross-appellant only on those invoices which showed Bentz's handwriting or where he admitted the handwriting was that of one of his employees.
They could have thought the fact Gilder accepted checks tendered created a conflict as to the five cent increase. They might have considered Gilder's acceptance of checks as an acknowledgement that the price was fair and reasonable and returned their verdict only on the ten percent letter and the cost of dowels purchased, disallowing the amount claimed for labor in installing dowels and disallowing the claimed five cents increase.
Since there were on the statement of claimed damages three items, other than the claim under the ten percent letter, it does not follow that because the verdict was for more than the amount claimed under the letter, the jury found for cross-appellee on each of the various items claimed.
For these reasons we are unable to say the circuit court erred in overruling the motion for a new trial on the question of damages alone. Certainly it was correct in overruling appellants' motion for a verdict for the full amount.
Affirmed on direct and cross-appeals.
ETHRIDGE, C.J., and RODGERS, BRADY and INZER, JJ., concur.